CITY OF ST. LOUIS, Plaintiff in Error, v. MORRIS EVRAIFF et al.

In Banc, November 20, 1923.

ZONING ORDINANCE: Police Regulation: Junk Shop: Unlawful Interference With Use of Private Property. An ordinance which divides a city into residence, commercial, industrial and unrestricted districts, and prohibits the erection or use of private property for the storage of scrap iron, rags and junk in the industrial district and permits its use for such purposes in the unrestricted district, and makes its violation a misdemeanor and subjects the offender to severe penalties, and based on the bare ground that such use of property is unlawful because the ordinance makes it unlawful, has no relation to the public health, safety, comfort or welfare, but is an unreasonable and oppressive interference with the use of private property, and is void:

Error to St. Louis Court of Criminal Correction.—*Hon. Chauncey J. Krueger,* Judge.

AFFIRMED.

*Henry S. Caulfield* and *George F. Haid* for plaintiff in error.

(1)    The city derives its charter in pursuance of the provisions of the Constitution of Missouri, and the police powers delegated therein are conferred by the State upon the city.   St. Louis Gunning Co. v. St. Louis, 235 Mo. 149; St. Louis v. Liessing, 190 Mo. 480.    (2)    The ''zoning'' ordinance in question is within the charter powers of the city.   St. Louis Gunning Co. v. St. Louis, 235 Mo. 143; Charter of St. Louis, art. I, secs. 25, 26, 34; St. Louis v. Fischer, 167 Mo. 654, 194 U. S. 361; Kansas City v. Oil Co., 140 Mo. 458.    (3)    The police power extends to all matters affecting the peace, order, health, morals, convenience, comfort and safety of its citizens.   Kidd v. Pearson, 128 U. S. 1;   C., B. & Q. Ry. Co. v. Drainage Comms., 200 U. S. 592;   Escanaba Co. v. Chicago, 107 U. S. 683;   City of Des Moines v. Manhattan Oil Co., 184 N. W. 827;   3 McQuillan on Municipal Corp. pp. 1884, 1885, 1886;   7 McQuillan on Municipal Corp. (Supplement) p. 7046;   Bacon v. Walker, 204 U. S. 317;   Noble State Bank v. Haskell, 219 U. S. 104;   Lake Shore & Mich. So. Ry. Co. v. Ohio, 173 U. S. 285; St. Louis Gunning Co. v. St. Louis, 235 Mo. 148.    (4)    Prima-facie, the municipal assembly is the sole judge of the necessity for an ordinance, and if reasonable on its face, the ordinance will be sustained, unless facts are shown which make it unreasonable.   St. Louis v. Theatre Co., 202 Mo. 690; St. Louis Gunning Co. v. St. Louis, 235 Mo. 204;   Cusack Co. v. Chicago, 242 U. S. 531;   Ex parte Quong Wo, 118 Pac. 714;   Lincoln Trust Co. v. Williams Bldg. Co., 229 N. Y. 313.    (5)    The party attacking the validity of an ordinance upon the ground of unreasonableness has the burden of showing unreasonableness.   St. Louis v. Theatre Co., 202 Mo. 701;   St. Louis Gunning Co. v. St. Louis, 235 Mo. 204;   Wagner v. St. Louis, 224 S. W. 413. (6)    The zoning ordinance in question is reasonable and does not violate any of the provisions of the Constitution of Missouri and is a valid exercise of the police power by the municipal assembly.   St. Louis v. Fischer, 167 Mo. 654, 194 U. S. 361;   St. Louis Gunning Co. v. St. Louis, 235 Mo. 148;   State ex rel. v. Cunningham, 97 Ohio St.

130; Hadacheck v. Los Angeles, 239 U. S. 394; Opinion of the Justices, 127 N. E. (Mass.) 525; Lincoln Trust Co. v. Williams Building Corp., 229 N. Y. 313; Ex parte Quong Wo, 118 Pac. (Cal.) 714; Cochran v. Preston, 108 Md. 220. (7) The fact that legislation under the police power may work a greater hardship on one than upon another does not render it invalid if its operation is a like upon all persons and property under the same circumstances and conditions. Barbier v. Connelly, 113 U. S. 27; Hadacheck v. Los Angeles, 239 U. S. 410; Salt Lake City v. Western Foundry Works, 187 Pac. (Utah) 829; Cusack Co. v. Chicago, 242 U. S. 530; Reinman v. Little Rock, 237 U. S. 177; C., B. & Q. Ry. Co. v. Drainage Comm's., 200 U. S. 591. (8) A proper exercise of the police power does not constitute the taking of property for public use without compensation, although its exercise may interfere with the full enjoyment of the property. C., B. & Q. Ry. Co. v. Drainage Commrs., 200 U. S. 561; Reinman v. Little Rock, 237 U. S. 177; Barbier v. Connelly, 113 U. S. 31; Cusack Co. v. Chicago, 242 U. S. 530; City of Des Moines v. Manhattan Oil Co., 184 N. W. 828.

*Karl Kimmel* for defendant in error; *E. M. Harber, E. F. Halstead, Glendy B. Arnold, Edward M. Bassett, D. D. Holmes, J. E. Turner* and *Albert L. Schmidt, amici curiae.*

(1) No person shall be deprived of property without due process of law. St. Louis v. Dreisoerner, 243 Mo. 217; St. Louis v. Dorr, 145 Mo. 466; St. Louis v. Hill, 116 Mo. 527; River Rendering Co. v. Behr, 77 Mo. 91; Ex parte Lerner, 218 S. W. 331; Buchanan v. Warley, 245 U. S. 60; U. S. Const., Amendment, Art. 5; U. S. Constitution, Amendment XIV, sec. 1. (2) Private property shall not be taken for public use without just compensation. St. Louis v. Hill, 116 Mo. 527; Art. II, sec. 21, Mo. Constitution. (3) A municipal ordinance must conform to the State law. Sec. 9582, R. S. 1909; Village of Jones-

berg v. Yocum, 195 S. W. 884; St. Louis v. Dreisoerner, 243 Mo. 217; St. Louis v. Meyer, 185 Mo. 583; St. Louis v. Tielkemeyer, 226 Mo. 130; State v. Stobie, 194 Mo. 15; St. Louis v. Williams, 235 Mo. 503; St. Louis v. Wortman, 213 Mo. 131. (4) The "zoning" ordinance is retroactive in its effect, because it applies to callings which are already established in prohibited districts. City of Willow Springs v. Withaupt, 61 Mo. App. 275. (5) It is the settled law that a municipal corporation "has no power by ordinance to declare that to be a nuisance which is not so in fact, or to suppress in part or *in toto* any business within its limits which is not a nuisance *per se*." St. Louis v. Dreisoerner, 243 Mo. 217; St. L. Gunning Co. v. St. Louis, 235 Mo. 147; St. Louis v. Packing Co., 141 Mo. 375. (6) The clause of the "zoning" ordinance upon which the information against the defendants was framed, refers to a calling, to-wit, the use of property for the storage of scrap iron, junk or rags, which is not a nuisance *per se*, nor had not become such as carried on by defendants. Hence the city had no power under its charter to prohibit or abate it. It was a gainful occupation which the defendants were lawfully entitled to pursue. The city had no specific power under its charter to regulate it, nor any authority so to do, under the general welfare clause, or as a police regulation. St. Louis v. Dreisoerner, 243 Mo. 217; St. Louis v. Dorr, 145 Mo. 466; St. Louis v. Hill, 116 Mo. 527; River Rendering Co. v. Behr, 77 Mo. 91. (7) A penal ordinance must be general in its terms and uniform in its application to the class of persons or subjects to be affected. Ex parte Lerner, 218 S. W. 331. (8) The zoning ordinance deprives the citizen of equal rights and protection under the law, and is therefore in violation of Amendment XIV, sec. 1, Const. of United States, and Article II, sec. 4, Const. of Missouri. Hays v. Poplar Bluff, 263 Mo. 516. (9) Legislation, either by the State or municipal corporation, which interferes with private property rights or personal liberty, cannot be sustained for purely aesthetic purposes, that have no relation to health, safety, con-

venience, comfort or welfare of the city.  People ex rel. Friend v. Chicago, 261 Ill. 16; Chicago v. Gunning System, 214 Ill. 628;   Buffalo v. Kellner, 153 N. Y. Supp. 472;  L. R. A. 1917A, 1241n.  (10)  The police power is a necessary and wholesome faculty of municipal government, but only extends to the regulation of employments prejudicial to the public safety, health, morals, and good government of the citizenry, and it "ends where those public interests are not beneficially served thereby." St. Louis v. Dreisoerner, 243 Mo. 217;  Gunning Co. v. St. Louis, 235 Mo. 200.

HIGBEE, C.—This is an action to recover the penalty prescribed for the violation of certain sections of Ordinance No. 30199 of the city of St. Louis, approved July 15, 1918, known as the "zoning" ordinance, which prohibits, *inter alia*, the erection or use of property for the storage of scrap iron, rags and junk in industrial districts, and permits the establishment and operation thereof in unrestricted districts.  The evidence shows that defendants, about October 1, 1918, established and conducted a rag and junk yard at Nos. 2026 and 2028 O'Fallon Street, a densely populated section within the industrial district established by the ordinance.  The court sustained a demurrer to the evidence on the ground that the ordinance is not authorized by any statute or law of the State and is unreasonable and violative of various sections of the Federal and State constitutions. From the judgment discharging the defendants, the city appealed.

Section 2 of the ordinance divides the city into five districts: first, residence: second, residence, commercial, industrial and unrestricted districts.  The boundaries of the several districts are shown upon a map made a part of the ordinance.  The industrial district comprises a little more than one square mile of territory within the city limits.  It extends westward from Third Street and, speaking generally, is bisected by Washington Avenue, one of the principal streets of the city.

Section 3 provides that the use of all buildings and premises at the time of the adoption of the ordinance may be continued.   Section 8 provides that no land or building in the industrial district shall be erected or used for about fifty specified trades, industries or uses, including "scrap iron, junk or rags storage or baling." Section 31 provides that any violation of the provisions of the ordinance shall be deemed a misdemeanor and subject the offender to a fine of not less than five nor more than five hundred dollars for each offense.   Each day that a violation is permitted to exist shall constitute a separate offense.

The Charter of the City of St. Louis provides that it shall have power:

"(25)   To define and prohibit, abate, suppress, and prevent or license and regulate all acts, practices, conduct, business, occupations, callings, trades, uses of property, and all other things whatsoever detrimental or liable to be detrimental to the health, morals, comfort, safety, convenience or welfare of the inhabitants of the city and all nuisances and causes thereof.

"(26)   To prescribe limits within which business, occupations and practices liable to be nuisances or detrimental to the health, morals, security or general welfare of the people may lawfully be established, conducted, or maintained.

"(34)   To enforce any ordinance, rule or regulation by means of fines, forfeitures, penalties, and imprisonment or by action or proceedings in its own courts or in any other court of competent jurisdiction or by any one or more of such means, and to impose costs as a part thereof."

The city of St. Louis is authorized to frame a charter "in harmony with and subject to the Constitution and laws of Missouri."   [Sec. 20, Art. IX, Mo. Constitution.] Its charter and ordinances must be subject to and in harmony with the Constitution and laws of the State. [St. Louis v. Meyer, 185 Mo. 583; St. Louis v. Williams, 235 Mo. 503, 508;   State ex rel. v. Shuck, 273 Mo. 51, 72; 28 Cyc. 351, (6).]

It is insisted by the plaintiff in error, and denied by the defendants, that in the exercise of the police power of the State the city has the power to enact the ordinance in question and to exclude the designated lines of business from the industrial district.  Plaintiff's counsel say:

"It is one thing to declare something a nuisance without rhyme or reason, but it is quite another thing to designate a certain territory to be used for certain purposes and prohibit its use for other purposes.  In the latter case, the thing prohibited is objectionable, because not permitted within the territory designated, and, therefore, the carrying on thereof in the prescribed territory is a nuisance in law, whether actually so or not."

In other words, a business is unlawful, not because it is a nuisance, but because it is prohibited.

In Lincoln Trust Co. v. Williams Building Corporation, 229 N. Y. 313, an ordinance of the city of New York dividing the city into a residence district, a business district and an unrestricted district, was held to be within the police power of the city.

In Reinman v. Little Rock, 237 U. S. 171, the city of Little Rock, by ordinance, prohibited the maintenance of livery stables within a limited district described in the ordinance.  Plaintiffs sued to restrain the enforcement of the ordinance.  The opinion recites: "It was averred (in the answer) that that district is in a densely populated and busy part of the city of Little Rock and that the stables are conducted in a careless manner, with offensive odors, so as to be productive of disease.  Plaintiffs did not contradict this, but demurred to the answer as insufficient in law, and the cause was heard in the trial court upon the complaint and exhibits, the answer and the demurrer.  The demurrer being sustained, and the defendants declining to plead further, a perpetual restraining order followed in due course."  Mr. Justice Pitney (l. c. 180), in affirming the judgment of the State court, which reversed the judgment of the trial court, said:

"If the record, including the opinion, leaves it a matter of doubtful inference upon what basis of fact the

State court rested its decision of the Federal question, it seems to us very plain, upon general principles, that we ought to assume, so far as the state of the record permits, that it adopted such basis of fact as would most clearly sustain its judgment. Hence, in the present case, we ought to and do assume that the Arkansas Supreme Court acted upon the basis of the facts set up in the answer of the city, treating them as sufficiently substantiated by the effect of the demurrer in admitting them to be true so far as properly pleaded. This being so, there is, as we have already remarked, no reasonable question of the validity of the ordinance, and the judgment of the Supreme Court is affirmed.''

The charter of the city of St. Louis authorizes the city ''to prohibit the erection of soap factories, stock yards and slaughter houses, pig pens, cow stables and dairies, coal oil and vitriol factories within prescribed limits and to remove and regulate the same; and to regulate or prevent the carrying on of any business which may be dangerous or detrimental to the public health.'' In City of St. Louis v. Fischer, 167 Mo. 654, 664, we said:

''The assembly may well determine that the keeping of a dairy in the outskirts of a city, where the population is sparse and the areas large, would not be a nuisance, whereas to permit a dairy in the thickly populated portion of the city, or near a schoolhouse, church or hospital, would seriously endanger the public health, and in the exercise of its plenary powers permit it in the one case and prohibit it in the other without being obnoxious to the criticism of partiality. Under the charter it is given legislative discretion in this matter. In our opinion the ordinance prescribed the limits and it was entirely proper and lawful to require every person desiring to erect or maintain a dairy to obtain permission by a proper ordinance, and such an ordinance is the only defense to an action like this. [St. Louis v. Howard, 119 Mo. 47.]''

In the Slaughter House Cases, 83 U. S. 36, l. c. 62, Mr. Justice MILLER said:

" 'Unwholesome trades, slaughterhouses, operations offensive to the senses, the deposit of powder, the application of steam power to propel cars, the building with combustible materials, and the burial of the dead, may all,' says Chancellor KENT (2 Commentaries, 340) 'be interdicted by law, in the midst of dense masses of population, on the general and rational principle, that every person ought so to use his property as not to injure his neighbors; and that private interests must be made subservient to the general interests of the community.' This is called the police power; and it is declared by Chief Justice SHAW that it is much easier to perceive and realize the existence and sources of it than to mark its boundaries, or prescribe limits to its exercise.

"This power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property. 'It extends,' says another eminent judge, 'to the protection of lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State; . . . and persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the State. Of the perfect right of the Legislature to do this no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.' "

In St. Louis v. Liessing, 190 Mo. l. c. 480, GANTT, J., said:

"The ordinance assailed has for its subject-matter the inspection of milk and cream and the regulation of the sale thereof. It is obviously a police regulation to guard against the sale or dissemination of an unwholesome and injurious quality of milk and cream and to protect the public against imposition, fraud and deception as to an article of food almost universally used by the people. The city of St. Louis, as has been repeatedly declared by

this court, derives its charter in pursuance of constitutional provisions, and the police powers delegated therein are conferred by the State upon the municipality, and so long as they are not inconsistent with the Constitution and laws of the State they are valid upon all who come within their scope and authority. [St. Louis v. Fischer, 167 Mo. 654, 194 U. S. 361; Kansas City v. Oil Co., 140 Mo. 458.] By the express provisions of Section 26, Article 3, of the Charter of St. Louis, authority is given 'for the inspection of butter, cheese, milk, lard and other provisions,' and 'to secure the general health of the inhabitants by any measure necessary,' and 'to pass all such ordinances as may be expedient in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufactures.' None of the objects sought to be secured by the charter are of more importance than the health of its inhabitants, and ordinances having such in view have been often upheld as an exercise of the police power of the State delegated to the city.''

In Re Opinion of the Justices, 127 N. E. 525, construing an amendment to the Constitution of Massachusetts, it was held (Syl. 3) that: ''An ordinance of a city or by-law of a town segregating manufacturing and commercial buildings, on the one side, from homes and residences, on the other, is justified by the broad conception of the police power created by Const. Amend. 60, giving the General Court power to limit buildings, according to their use or construction, to specified districts of cities and towns.'' We quote on page 528:

''The part of the first sentence of Section 2 which challenges most serious attention is the provision that heed shall be given in combination with the other factors there named to that which 'will tend to improve or beautify the city or town' and 'will harmonize with its natural development.' It has been decided quite generally, if not universally, by courts in which the question has been raised, that aesthetic considerations alone or as the main end do not afford sufficient foundation for imposing limitations upon the use of property under the police power.

[See cases collected, James Byrne v. Maryland Realty Co., 129 Md. 202, 98 Atl. 547, L. R. A. 1917A, 1216.] Before the adoption of amendment 60, it was said by Chief Justice KNOWLTON in Welch v. Swasey, 193 Mass. 365, 375, 79 N. E. 745, 118 Am. St. 523, 23 L. R. A. (N. S.) 1160: 'The inhabitants of a city or town cannot be compelled to give up rights in property, or to pay taxes, for purely aesthetic objects; but if the primary and substantive purpose of the legislation is such as justifies the act, considerations of taste and beauty may enter in, as auxiliary.'

"We think that this is an accurate statement of property rights under the Constitution of the United States. While the Supreme Court of the United States has not decided, so far as we are aware, that the exercise of the police power cannot rest on aesthetic considerations alone as its sole basis. We draw the inference from what has been said on that subject that at present at all events that foundation, standing alone, hardly would be regarded as sufficient, but it may be considered in a subsidiary way. In Welch v. Swasey, 214 U. S. 91, at page 107, 29 Sup. Ct. at page 567, 53 L. Ed. 923, reference was made, apparently as ground for upholding the statute, to the fact that this court had held in deciding that case, and in Commonwealth v. Boston Advertising Co., 188 Mass. 348, 74 N. E. 601, 69 L. R. A. 817, 108 Am. St. 494, that 'the police power cannot be exercised for a merely aesthetic purpose.' In St. Louis Poster Advertising Co. v. St. Louis, 249 U. S. 269, 39 Sup. Ct. 274, 63 L. Ed. 599, a case upholding severely restrictive police regulations as to the construction and maintenance of billboards, it was said by Mr. Justice HOLMES: 'Possibly one or two details, especially the requirement of conformity to the building line, have aesthetic considerations in view more obviously than anything else. But as the main burdens imposed stand on other ground, we should not be prepared to deny the validity of relatively trifling requirements that did not look solely to the satisfaction of rudimentary wants that alone we generally recognize as necessary. [Hubbard v. Taunton, 140 Mass. 467, 468.]'"

It will be noted in the above case that the amendment to the Constitution authorized the ordinance limiting buildings according to their use or construction, to specified districts of cities and towns.

An ordinance of the city of Los Angeles divided the business section of the city into seven districts, and declared the remainder to be a residence district, and made it unlawful to carry on certain occupations, including laundries and wash-houses, within the residence district. In Ex parte Quong Wo, 118 Pac. 714, l. c. 717, the court said:

"It must be admitted, of course, that the business of conducting a public laundry is a lawful and necessary occupation, and that such a laundry is not necessarily a nuisance *per se*. But this fact alone does not prevent the enactment of such regulations regarding it as may be reasonably found necessary for the safety, health, and comfort of society at large. There are many lawful and necessary occupations, not constituting nuisances *per se,* as to which such regulations by a city have been found necessary. It was said in Ex parte Lacey, 108 Cal. 326, 41 Pac. 411, 38 L. R. A. 640, 49 Am. St. 93, involving the question of the validity of an ordinance prohibiting the operation of any steam shoddy machine, or steam carpet-beating machine, within one hundred feet of any church, schoolhouse or dwelling house: 'Indeed, as to nuisances *per se,* the general laws of the State are ample to deal with them. But the business here involved may properly be classed with livery stables, laundries, soap and glue factories, etc., a class of business undertakings in the conduct of which police and sanitary regulations are made, to a greater or less degree by every city in the country.' "

The contention in this case was that the exclusion of laundries and wash-houses from the residence district was a discrimination against the Chinese. It was held to be a reasonable regulation for the safety, health and comfort of society at large. The court further said, at the foot of page 718: "The necessity of such regulation in

the case of necessary and lawful occupations carried on in cities and towns was recognized by the Supreme Court of the United States in Crowley v. Christensen, 137 U. S. 90, 11 Sup. Ct. 15, 34 L. Ed. 620, where it is said: 'Some occupations by the noise made in their pursuit, some by the odors they engender, and some by the dangers accompanying them, require regulation as to the locality in which they shall be conducted.' "

St. Louis Gunning Company v. St. Louis, 235 Mo. 99, is strongly relied on by plaintiff. It involved the legality of an ordinance regulating bill-boards. What Judge WOODSON said, l. c. 173 et seq., is pertinent to the question now under consideration, and is as follows:

"In discussing this question, the Supreme Court of California, in the case of Varney v. Williams, 155 Cal. 318, said: 'If the bill-boards constituted a public nui-sance, a court of equity would refuse any writ designed to perpetuate their maintenance, regardless of the valid-ity of the ordinance under which defendants assume to proceed. [McQueen v. Phelan, 4 Cal. App. 695, 88 Pac. 1099.] But the finding that the boards did constitute a nuisance is attacked as contrary to the evidence. It is not contended by respondents that any nuisance in fact ex-isted, unless it resulted from the mere circumstance that structures were maintained contrary to the terms of the ordinance. The single question for decision, therefore, is whether the enactment of this ordinance was within the legislative power of the town of East San Jose. Except for the limited exemption conferred by Section 3, the ef-fect of the ordinance is to absolutely prohibit the erection or maintenance of bill-boards for advertising purposes. There is no attempt to restrict the operation of the enact-ment to bill-boards that may be insecure or otherwise dangerous, or to advertising that may be indecent. The town trustees have undertaken to make criminal the main-tenance of any bill-board, however securely it may be built, and however unobjectionable may be the advertising matter displayed on it. Such prohibition, involving a very substantial interference with the rights of property, can

be justified, if at all, only to the extent that the subject-matter of the legislation is embraced within the police power of the State.   Bearing in mind that the ordinance does not purport to have any relation to the protection of passers-by from injury by reason of unsafe structures, to the diminution of hazard of fire, òr to the prevention of immoral displays, we find that the one ground upon which the town council may be thought to have acted is that the appearance of bill-boards is, or may be, offensive to the sight of persons of refined taste.   That the promotion of aesthetic or artistic considerations is a proper object of governmental care will probably not be disputed.   But, so far as we are advised, it has never been held that these considerations alone will justify, as an exercise of the police power, a radical restriction of the right of the owner of property in an ordinary and beneficial way. Such restriction is, if not a taking *pro tanto* of the property, a damaging thereof, for which, under Section 14 of Article 1 of the Constitution, the owner is entitled to compensation.'

"In the case of Bryan v. City of Chester, 212 Pa. St. 259, the Supreme Court of Pennsylvania decided two questions, first, that a municipality had no authority to enact an ordinance prohibiting the erection of bill-boards on private property simply because such boards were unsightly, or may create a nuisance; and, second, that such municipality may prohibit the erection of insecure bill-boards within its limits, prevent the exhibition of immoral or indecent advertisements or pictures, and protect the community from any actual nuisance resulting from the use of them.   That case rests upon sound doctrine also; but there is nothing contained therein which militates against the rule which authorizes municipalities to enact ordinances which prescribe reasonable standards and rules, in the nature of minimum requirements, by which the erection of all insecure and dangerous bill-boards are prohibited from being erected.

"It must be remembered that there are thousands of these bill-boards in the city, and they are in the very

nature of things temporary structures, generally consisting of one frail narrow line of boards nailed to upright posts set in the ground, and cheaply constructed. . . . Most of them are so constructed that their bodies or wings are wide-spread like the sails of a great vessel and they gather the winds, and if not properly and securely constructed they will more than likely be blown down when the first high wind strikes them, and inflict injury upon those who are upon the streets. Not only that, but if they are not constructed according to reasonable regulations, then in the very nature of things, as before shown, they become the evil wing which shelters, incubates and gives life and being to the nuisances before mentioned. It is axiomatic that if a municipality has the authority to abate an existing nuisance, then it must likewise have the power to adopt all reasonable rules and standards by which their creation will be prevented.

"None of these things could be accomplished by the city of St. Louis if she is not permitted in the first instance to adopt reasonable rules and standards by which bill-boards are to be constructed, thereby rendering them safe and destitute of nuisance incubation.

"In the case of State v. Whitlock, 149 N. C. 542, BROWN, J., of the Supreme Court of North Carolina, in speaking for the court upon this subject, said:

" 'While this is true, yet it is fundamental law that the owner of land has the right to erect such structures on it as he may see fit, and put his property to any use which may suit his pleasure, provided that in doing so he does not imperil or threaten harm to others. [Tiedman, Lim., 439.]

" 'All statutory restrictions of the use of property are imposed upon the theory that they are necessary for the safety, health or comfort of the public, but a limitation which is unnecessary and unreasonable cannot be enforced. Although the police power is a broad one, it is not without its limitations, and a secure structure upon private property, and one which is not *per se* an infringement upon the public safety, and is not a nuisance, can-

not be made one by legislative *fiat* and then prohibited. [Yates v. Milwaukee, 10 Wall. 497; 1 Dillon, Mun. Corp. 374.]

" 'It is undoubtedly within the power of the corporate authorities of the city of Asheville to prohibit the erection of insecure bill-boards or other structures along the edge of the public streets, or so near as to be a menace, to require the owners to maintain all structures so located in a secure condition, and to provide for inspection and removal at the owner's expense, if condemned as dangerous. The city authorities may also adopt regulations as to the manner of construction of bill-boards, so as to insure safety to the passers-by, but the prohibition of structures upon the lot line, however safe they may be, is an unwarranted invasion of private right, and is so held to be by all the courts which have passed upon the precise question, as we are now advised.' "

In Haller Sign Works, 249 Ill. 436, 94 N. E. 920, 34 L. R. A. (N. S.) 998, it was held that the right to the use of property is unconstitutionally interfered with by a statute forbidding, under penalty, the erection and maintenance of any structure for advertising purposes within five hundred feet of a public park or boulevard. The court said, on page 1001:

"The natural right every citizen has to use his property according to his own will is necessarily subject to the limitation that in such use others shall not be injured.

"All uses of property or courses of conduct which are injurious to the health, comfort, safety, and welfare of society may be prohibited under the sovereign power of the State, even though the exercise of such power may result in inconvenience or loss to individuals. In this respect individual rights must be subordinate to the higher rights of the public. The power that the State may exercise in this regard is the overruling law of necessity, and is founded upon the maxim, *Salus populi suprema lex est.* The existence and exercise of this power are an essential attribute of sovereignty, and the establishment of government presupposes that the individual citizen surrenders

all private rights the exercise of which would prove hurtful to the citizens generally.   [Chicago v. Rogers Park Water Co., 214 Ill. 212, 73 N. E. 375; Mugler v. Kansas, 123 U. S. 623, 31 L. Ed. 215, 8 Sup. Ct. Rep. 273.]

"While the general principle above announced is uniformly recognized, it is equally true that the owner of property has the right to make any use of it he desires that does not endanger or threaten the safety, health, comfort, or general welfare of the public."

It was held in St. Louis v. Baskowitz, 273 Mo. 543, that under its charter the city had power to license and regulate junk dealers, for the reason that junk shops, like those of pawnbrokers and dealers in second-hand goods, are favorite places in which to dispose of stolen property, and rags collected there may be contaminated by germs of disease (p. 565).

In St. Louis v. Dorr, 145 Mo. 466, we held that "an ordinance providing that the houses fronting on a certain street 'shall be used for residences only, and no business avocation whatever shall be allowed to be followed in the same,' imposes such restrictions upon the ownership of private property that it cannot be upheld as a proper exercise of a municipality's general power to regulate the use of its streets" (Syl. 1).  The overwhelming weight of authority accords with this ruling.  [Byrne v. Maryland Realty Co., 98 Atl. 547, L. R. A. 1917A, 1216, and annotations.]

In St. Louis v. Dreisoerner, 243 Mo. 218, 147 S. W. 498, 41 L. R. A. (N. S.) 177, we condemned an ordinance prohibiting certain industries, including any manufacturing plant wherein machinery of any kind might be used within six hundred feet of Tower Grove Park, without permission from the Municipal Assembly by a proper ordinance.  Bond, J., delivering the opinion in Division One, said:

"A municipal corporation only possesses and can exercise the following powers:  (1)  Those granted in express words;  (2) those necessarily or fairly implied in or incident to the powers expressly granted;  (3) those

essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied. [St. Louis v. Bell Telephone Co., 96 Mo. l. c. 628; St. Louis v. Eddy, 123 Mo. l. c. 557; City of Independence v. Cleveland, 167 Mo. 388.] In the exercise of such powers a municipal corporation can enact no ordinance which violates the Constitution of the State or the United States, or which contravenes the statutes and decisions of this State. It is the settled law that a municipal corporation 'has no power by ordinance to declare that to be a nuisance which is not so in fact, or to suppress in part or *in toto* any business within its limits which is not a nuisance *per se*.' [St. Louis Gunning Co. v. St. Louis, 235 Mo. l. c. 147, et cases cited.] The clause of the ordinance upon which the information against defendant was framed refers to a calling which is not a nuisance *per se*, nor had it become such as carried on by defendant. Hence the city of St. Louis had no power under its charter to prohibit or abate it. It was a gainful occupation which the defendant was lawfully entitled to pursue in the manner which the evidence shows. The city had no specific power under its charter to regulate it, nor any authority so to do under the general welfare clause or as a police regulation. [St. Louis v. Dorr, 145 Mo. 466.] The police power is a necessary and wholesome faculty of municipal government, but it only extends to the regulation of employments prejudicial to the public safety, health, morals, and good government of the citizenry, and it 'ends where those public interests are not beneficially served thereby.' [Gunning Co. v. St. Louis, supra, l. c. 200.] It cannot sanction the confiscation of private property for aesthetic purposes. It was not shown in this case that there was any status of affairs in St. Louis which demanded the inclusion within this ordinance of a prohibition against the maintenance of a 'manufacturing plant of whatsoever size, wherein machinery of any kind whatsoever shall be maintained or operated by means of

steam, electricity, gas or other motive power, in any building, or any lot of ground within six hundred feet of Tower Grove Park.'

"We think this provision was an unwarranted exercise of power by the municipal assembly; that it is unreasonable on its face; and if applied to the calling of defendant, it would deprive him of the full uses of his property without compensation and without due process of law. It is therefore void and afforded no warrant whatever for his conviction by the lower court."

It is not contended that the business of dealing in rags and junk is not a lawful occupation. Indeed it must be conceded that it is a lawful business. It results in the saving and utilization of vast quantities of property that otherwise would be sheer waste. It is therefore a necessary occupation.

It is said, however, that rags which accumulate in a junk shop may spread infectious and contagious diseases. That is doubtless true. That may, however, be said of second-hand clothing, furniture, books, etc. It is true of bank bills and all articles that pass from hand to hand. The danger that may lurk in rags, second-hand clothing and the like, is ample justification for the regulation of the business of dealers in such articles.

There are cases that seem to sustain appellant's contention (See Lincoln Trust Co. v. Bldg. Corp., supra, and State ex rel. Twin City Bldg. & Invest. Co. v. Houghton, 8 A. L. R. 585 and annotations), but they are not in accord with the rulings of this court and are opposed to the great weight of authority. It is clear that the exercise of the police power in reference to private occupations is limited to such regulations as may be reasonably necessary for the protection of the peace, health and comfort of society. Livery stables, dairies, laundries, soap and glue factories, in short, all trades and occupations prejudicial to the health, morals and good government of the citizens, may be restricted. But in all cases whether the business or occupation is a nuisance or not is a question of fact. Regulations based on aesthetic considerations are not in ac-

cord with the spirit of our democratic institutions. It must be assumed that defendants conducted their business in accordance with the ordinance regulating dealers in junk. That is necessarily conceded by appellant's contention, that it is unlawful because it is prohibited. "The owners of city lots or other property in a city may keep them and use them as they wish, free from interference on the part of the municipality, provided that in so doing they do not create and maintain a nuisance or cause inconvenience, damage or harm to others." [28 Cyc. 735.]

After very carefully considering the learned and interesting briefs and arguments of counsel, we think it clear that the ordinance, so far as involved in this case, is unreasonable and oppressive; that it imposes restrictions upon the use of private property that have no relation to the health, safety, comfort or welfare of the inhabitants of the city; that it is an unlawful deprivation of the use of defendants' property without compensation or due process of law, a denial of the enjoyment of the gains of their own industry, and that the enactment of the ordinance is not within the powers delegated to the city.

The judgment is affirmed. *Woodson, C. J.,* and *David E. Blair* and *Walker, JJ.,* concur; *Graves, J.,* concurs in the result; *James T. Blair, Ragland* and *White, JJ.,* dissent.

GRAVES, J. (concurring).—In this case I concur in the result of the opinion, but base this limited concurrence upon the grounds stated in my separate concurring opinion in State ex rel. Penrose Investment Company v. McKelvey, 301 Mo. 1.